**Telena D. WOOLSEY,**
**Plaintiff–Appellee,**

v.

**James C. HUNT, Chancellor of University of Tennessee Center for Health Sciences; Arnold E. Postlethwaite, Director of the Connective Tissue Diseases Division of the Department of Medicine; and the University of Tennessee, Defendants–Appellants.**

**No. 90–5083.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 5, 1990.
Decided May 9, 1991.

**556**

Wanda S. Donati and Donald A. Donati (argued), Donati & Associates, Memphis, Tenn., for plaintiff-appellee.

Ronald C. Leadbetter, Assoc. Gen. Counsel (argued), Beauchamp E. Brogan, Knoxville, Tenn., and JoAnn C. Cutting, Asst. Gen. Counsel, Memphis, Tenn., for defendants-appellants.

Before KEITH, KENNEDY and SUHRHEINRICH, Circuit Judges.

KEITH, Circuit Judge.

James C. Hunt, M.D. ("Hunt"), Chancellor of the University of Tennessee Center for Health Sciences ("UTCHS"), Arnold E. Postlethwaite, M.D. ("Dr. Postelthwaite"), Director of the Connective Tissue Diseases Division ("CTDD") of the Department of Medicine, and the University of Tennessee ("University"), defendants-appellants (collectively "defendants"), appeal from the district court's June 21, 1989, judgment and damages award entered pursuant to 42 U.S.C. § 1983 in favor of plaintiff-appellee, Telena D. Woolsey ("plaintiff"). For the reasons set forth below, we REVERSE.

### I.

### STATEMENT OF THE CASE

#### A.

### STATEMENT OF THE FACTS

Plaintiff was first employed at UTCHS on February 9, 1977, as a senior secretary in CTDD. Prior to her employment, plaintiff had been an executive secretary for a number of years. On September 1, 1981, plaintiff's position was reclassified and upgraded, resulting in a promotion to the position of office supervisor in the division. Among her duties were secretarial duties for the chief of the section, administrative duties, as well as training and supervision of office personnel.

Plaintiff's 1983–1984 evaluation by the then CTDD Director, Dr. Robert S. Pinals ("Dr. Pinals") was outstanding. In the evaluation, Dr. Pinals described plaintiff as "an excellent employee, very efficient, devoted to her job...." In the spring of 1984, Dr. Pinals decided to accept a position as chairman of the Department of Medicine at Princeton University. Dr. Postlethwaite was designated to assume the position of CTDD Director previously occupied by Dr. Pinals. Shortly after Dr. Postlethwaite had been named Dr. Pinals' successor, on March 28, 1984, Dr. Postlethwaite informed Dr. Pinals that he wanted plaintiff to leave when Dr. Postlethwaite assumed the directorship. Dr. Pinals advised Dr. Postlethwaite that there must be cause for such an action and that no cause existed. Dr. Postlewaithe responded that he would document cause.[1] Dr. Pinals made a written record of this conversation and signed it on April 2, 1984.

After his conversation with Dr. Pinals, Dr. Postlethwaite consulted Scott McDaniel ("McDaniel"), business manager for the Department of Medicine, about reorganizing CTDD. McDaniel referred the matter to Paula Harris ("Harris"), then Director of personnel services. Harris approved Dr. Postlethwaite's proposed reorganization, which included the elimination of plaintiff's position of office supervisor.

---

[1] The district court made no finding about why Dr. Postlethwaite wanted plaintiff to leave the department. The district court did, however, find that Dr. Postlethwaite's actions were motivated more by a desire to get rid of plaintiff than a desire to rid himself of a poor organizational structure. In this vein, the district court stated:

There is some evidence to suggest that Postlethwaite resented Pinals and wanted to get rid of plaintiff because she had been Pinals' trusted assistant. There is also evidence suggesting that Postlethwaite simply felt that the office supervisor's position created confusion and frustration on the part of senior secretaries in the department and this organizational structure resulted in the secretaries receiving orders from too many people.
Joint Appendix at 30 (Findings of Fact and Conclusions of Law).

During this time, Dr. Pinals informed plaintiff about his conversation with Dr. Postlethwaite. Before Dr. Postlethwaite assumed his duties as CTDD director, plaintiff learned about Dr. Postlethwaite's plans for reorganization. Plaintiff promptly sought the advice of Roland Woodson ("Woodson"), UTCHS Director of employee relations. On or by April 2, 1984, Woodson assured plaintiff that Dr. Postlethwaite could not "get rid" of her through reorganization. Woodson conveyed to plaintiff that he considered what was being done to her immoral and unjust. Woodson also expressed his opinion regarding Dr. Postlethwaite's treatment of plaintiff to Woodson's superiors, Howard Carman ("Carman"), Vice Chancellor for Facilities Management and Human Resources, and Dr. T. Earle Bowen ("Bowen"), Vice Chancellor for Administration. Bowen informed plaintiff also that Dr. Postlethwaite's action in seeking to terminate plaintiff through departmental reorganization was illegal and could not be done.

On June 29, 1984, plaintiff received a reappointment letter from Bowen. In the letter, Bowen advised plaintiff that her salary, effective July 1, 1984, would be at a monthly rate of $1,254, and an annual rate of $15,048. The letter stated that the terms and conditions of her employment with the University were in accordance with the policies and procedures set forth in the Personnel Policies and Procedures Manual. The employment status policy referred to at that time stated that regular staff non-exempt employees were employed "for a term that is expected to be six months or more." Joint Appendix at 32 (Findings of Fact and Conclusions of Law). A new employment status policy took effect on July 1, 1984, which stated that all non-faculty employees "are not employed for a specified time, but, instead, serve on an 'at will' basis, subject to the policies and procedures set forth in the Personnel Policies and Procedures Manual." *Id.* at 242. The revised policy also contained the language included in the old policy stating that employees in plaintiff's category were employed for a term expected to be six months or more. The district court found

that there was no evidence that any of the parties involved were aware of the revision at any time pertinent to this lawsuit.

Despite the assurances to plaintiff from University officials that Dr. Postlethwaite's reorganization plan was not a legitimate action, plaintiff received notification of the elimination of her position from Dr. Postlethwaite in a memorandum dated July 1, 1984, the date he assumed the duties of CTDD director. The memorandum stated that, effective July 31, 1984, her position would be eliminated because of departmental reorganization; the memorandum also advised plaintiff to apply for employment elsewhere within the University.

On July 17, 1984, plaintiff initiated a grievance pursuant to the University's employee grievance policy concerning the elimination of her position as senior secretary and office supervisor. Her grievance addressed two additional matters pertaining to the elimination of her position. She complained that junior secretaries were being retained, while her position as a senior secretary and office supervisor, was being eliminated. She also complained that the elimination of her position was as a result of Dr. Postlethwaite's "personal whim" to "get rid" of her "without due cause." Plaintiff requested reversal of the plan to eliminate her position and the cessation of further threats to terminate her position within CTDD.

Subsequently, plaintiff's 1983–1984 outstanding evaluation by Dr. Pinals was reduced to satisfactory. McDaniel notified plaintiff of the reduction on July 25, 1984. In a July 26, 1984, letter to plaintiff, McDaniel claimed that Dr. Pinals had requested this downgrading in the evaluation. Further, McDaniels claimed that Dr. Pinals had not timely requested approval of plaintiff's outstanding evaluation from the Dean of the College of Medicine. McDaniel characterized the downgrading of plaintiff's performance evaluation as part of a random process to comply with the mandate from the University to limit the number of employee evaluations in each of the four categories. McDaniel testified before the district court that plaintiff's perform-

ance evaluation had been reduced several weeks earlier, but that he had inadvertently forgotten to notify her until July 25, 1984. The district court did not credit the latter testimony because McDaniel admitted that all other employees whose evaluations had been downgraded were notified in May. Further, the district court admitted into evidence Dr. Pinals' timely request for an outstanding evaluation for plaintiff on April 25, 1984. Following notification of her performance evaluation downgrade, plaintiff filed a second grievance concerning the evaluation.

On July 23, 1984, plaintiff met with Harris and Carman. Carman offered plaintiff continued employment of one to two months if she would drop the grievance. Plaintiff refused. Carman and Harris then agreed to extend her employment indefinitely to allow her to seek other employment at the University. Harris confirmed this agreement by letter to plaintiff dated July 24, 1984. The letter stated that the reorganization of CTDD had affected plaintiff's duties and that her new responsibilities would be defined by the administrators of that division.

On July 26, 1984, Dr. Postlethwaite advised plaintiff by letter that her employment in CTDD was being extended beyond July 31, 1984. The letter also directed her to report as a temporary secretary to another part of the division. Plaintiff was instructed to vacate her office by July 30, 1984. While removing her belongings from her office on July 27, 1984, in compliance with Dr. Postlethwaite's order, plaintiff injured her wrists. As a result of this injury, plaintiff was initially put on authorized sick leave. This was subsequently converted to a leave of absence under worker's compensation. Plaintiff was on leave from the University from July 27, 1984, until her termination on October 8, 1984.

Between July 16 and September 28, 1984, plaintiff continued her efforts to process her grievances and obtain a hearing before

University officials.[2] Plaintiff encountered several obstacles to the prompt processing of her grievance. The Department chairperson, Dr. Andrew Kang ("Dr. Kang"), did not initially respond to plaintiff's first grievance. Plaintiff then attempted to submit the grievance to Dean Robert Summitt ("Dean Summitt"). Dean Summitt refused to hear the grievance until Dr. Kang first considered the matter. On August 16, 1984, still having received no response from Dr. Kang, plaintiff wrote to Dr. Kang regarding her grievance. Dr. Kang responded on August 17, 1984, by upholding both Dr. Postlethwaite's removal of plaintiff from her position in CTDD and the downgrading of her performance evaluation. Immediately thereafter, plaintiff appealed to Dean Summitt. Dean Summitt delegated the responsibility for resolving the grievance to Raymond H. Colson, Associate Dean for Administration of the College of Medicine ("Colson").

Colson issued a written memorandum decision regarding plaintiff's first grievance on September 4, 1984. Colson supported Dr. Postlethwaite's decision to eliminate plaintiff's position within CTDD, but recommended that she "be retained as a regular full-time employee within the Rheumatology Division for up to six months at her current rate of pay while she looks for a suitable transfer." Joint Appendix at 208. Colson also upheld the downgrade of plaintiff's performance evaluation. The written decision concluded with the statement that should the findings and conclusions not satisfy the employee, plaintiff was requested to contact the Personnel Office in order to process her grievance to the next level.

During a meeting to discuss Colson's recommendation, plaintiff expressed to him her satisfaction with the six-month extension of employment. She indicated, however, that she was not satisfied with Colson's failure to address Dr. Postlethwaite's attempt to terminate her without cause.

2. Under the University's grievance procedure, the employee must file within five days of the director's adverse action. The departmental chairman then has five days in which to reply to the employee. If the chairman fails to respond, then the employee can present the grievance to the dean. If the employee is not satisfied with the dean's action, then the employee can request a hearing before the employee relations committee.

Plaintiff also expressed her dissatisfaction with the resolution of her performance evaluation grievance.

On September 7 and 11, 1984, plaintiff wrote memoranda to Woodson informing him of her desire to appeal Colson's decision and proceed to a hearing before the grievance committee on both the job elimination without cause and the performance evaluation downgrade. Woodson granted plaintiff the grievance hearing by letter on September 14, 1984.

During the interim, while still on medical leave, plaintiff unsuccessfully interviewed for other positions within the University. The Personnel Office directed plaintiff not to discuss her salary on these interviews because her current pay level would be guaranteed and the Personnel Office would inform the interviewers that plaintiff's salary would be supplemented.

On September 19, 1984, Dr. Postlethwaite wrote to plaintiff extending an offer of a senior secretary position in CTDD. The position required ninety-five percent typing. Plaintiff declined the offer in writing, stating that her current disability precluded her from taking a position involving heavy typing. Plaintiff did, however, express interest in another vacant senior secretary position in the division which would allow her to do less typing and gradually regain her typing skills.

On September 25, 1984, Harris contacted plaintiff twice by telephone to arrange a meeting on September 28, 1984, to discuss plaintiff's situation. During the first telephone conversation, Harris advised plaintiff that Dr. Postlethwaite could not be available for a grievance hearing during the week of October 1, 1984, as plaintiff had requested. Also on September 25, 1984, Dr. Postlethwaite wrote to plaintiff offering her the senior secretary position she had expressed interest in. Dr. Postlethwaite described the job as consisting of sixty percent typing. Plaintiff, however, recalled the position as consisting of only thirty percent typing. In his letter, Dr. Postlethwaite further stated:

> [S]ince your current approved sick leave extends thru [sic] September 30, 1984, I will need to know your written response (accept or reject) to this job offer and to the ... senior secretary offer of September 19, 1984, on or before 8:00 A.M. October 1, 1984. Send your notification to UTCHS Personnel. If you accept either position, you should report to my office at 8 AM [sic] October 1, 1984 for orientation as to the specifics of the job.

Joint Appendix at 39 (Findings of Fact and Conclusions of Law).

Plaintiff, Carman, Harris and Woodson met on September 28, 1984.[3] During the

---

**3.** Plaintiff taped the meeting and a transcript of the entire conversation which took place was admitted into evidence, by stipulation of the parties, and provides an accurate account of what occurred. Conflicting testimony was tendered at trial regarding the purpose of this meeting. Harris, Woodson and Carman testified that the purpose of the meeting was to resolve plaintiff's grievances. Harris and Carman further testified that they felt the meeting had come to an end with a clear understanding that plaintiff was required to report to work on October 1, 1984, or provide medical documentation to extend her leave status beyond September 30, 1984. The district court found that the transcript indicated that this testimony by defendants' witnesses was inaccurate. The district court found that the following were established during the meeting, crediting plaintiff's testimony and the transcripts:

> Carman confirmed with plaintiff that Postlethwaite had offered her two different jobs. Plaintiff reiterated to those in attendance that she could not do the ninety-five percent typ-

ing job and that she questioned whether she could do the sixty percent job at that time. She noted that in her estimation the job in which she had expressed interest had in the past required only thirty percent typing. Plaintiff indicated that she wanted to discuss the sixty percent typing job with Postlethwaite before she made a decision as to whether to accept it. She presented a letter dated September 28, 1984, stating her reservations about the sixty percent job and her desire to discuss it. Contrary to defendants' assertions, plaintiff did not decline the second job offer. In response to this discussion it was agreed that plaintiff, Harris, Woodson and Postlethwaite would meet on Monday, October 1, to discuss this second job offer.

> Plaintiff's medical disability was also discussed at the meeting. Harris several times mentioned her belief that plaintiff's leave of absence expired September 30, 1984. Plaintiff repeatedly informed Harris that this was not correct, and that she had been advised shortly before the meeting by payroll assistant

meeting, plaintiff and Harris arranged to meet with Dr. Postlethwaite on October 1, 1984. On October 1, 1984, plaintiff called Harris and cancelled her appointment scheduled for later that day to discuss the second job offer with Dr. Postlethwaite. Plaintiff explained that she was physically unable to keep the appointment, in part because of stress. She also stated that she would not engage in any future proceedings until the grievance hearing was concluded.

Subsequently, plaintiff had no further contact with University officials until she received two letters, both dated October 8, 1984. The first letter, from Woodson, advised plaintiff that her grievances had been resolved and that he was concluding his responsibility in the matter. The letter indicated that the September 28, 1984, meeting had been held for and had served the purpose of addressing the grievance.[4] The letter further stated that the University's response to her grievance had been to offer two positions at plaintiff's current salary. These positions, Woodson noted, were the original jobs plaintiff had requested, therefore there existed no further need to proceed with the grievance process. The letter also informed plaintiff that her performance evaluation would be changed to excellent, one category below outstanding and one above satisfactory.

The second letter dated October 8 was from Dr. Postlethwaite and stated:

> Eva Gray that she could not return to work until she was released by her doctor. Plaintiff had not been released and indicated that she was still being treated for both stress and her wrist injury. In view of this disagreement between plaintiff and Harris about the expiration date of plaintiff's leave of absence, Carman, who was Harris' superior, several times told plaintiff that he would give her "the benefit of the doubt," thus indicating that plaintiff's leave of absence would not expire on September 30, 1984. Plaintiff was not told that she was required to report to work on Monday [October 1] or justify her absence by medical documentation. Any obligation to report on Monday was mentioned solely in the context of an assumption that plaintiff's leave expired on Monday—an assumption which was in fact erroneous, which plaintiff told Harris, Carman and Woodson was erroneous and about which Carman told plaintiff he would give her the "benefit of the doubt."

On September 28, 1984, you advised Personnel that you did not wish to accept this second job offer.

In sum, we have offered you all available vacant clerical positions within the Division. You have declined my offers of continued employment in these positions and have failed to furnish me with satisfactory documentation justifying your continued absence from your job.

Therefore, in accordance with my letter of September 28, I consider your non-acceptance of my offers of continued employment and your unexcused failure to report to work as a voluntary resignation under [University] UT Personnel Policy, 505, Pol. Your University termination will not interrupt any salary replacement awarded by the State Board of Claims as a result of your Worker's Compensation claim if approved. Your final pay will include all accumulated annual leave.

Should you be interested in other employment within the University, you may contact Human Resources to be considered for available openings for which you qualify, upon release from your doctor.

*Id.* at 240–41.[5]

## B.

## PROCEDURAL HISTORY

On November 9, 1984, plaintiff filed suit in district court, pursuant to 42 U.S.C.

---

Joint Appendix at 40–41 (Findings of Fact and Conclusions of Law).

**4.** The district court found that neither of plaintiff's pending grievances had been resolved at the September 28 meeting. The evaluation grievance was not discussed at all nor was the job elimination grievance addressed beyond Woodson indicating that the grievance hearing would be held in the future. Joint Appendix at 41 (Findings of Fact and Conclusions of Law).

**5.** The district court found that the statements contained in Dr. Postlethwaite's letter did not conform to the record because plaintiff did not advise personnel on September 28 that she was declining the second job offer. Rather, she indicated that she wished to discuss the offer with Dr. Postlethwaite. Although plaintiff did cancel her appointment with Dr. Postlethwaite on October 1, the district court found that plaintiff at

§ 1983, claiming that she was wrongfully and illegally discharged without notice of the charges against her and without opportunity for a pre-termination hearing as required by the due process clause of the fourteenth amendment and by the University's rules and regulations.

A bench trial was held on September 17, 23, 24, October 29 and November 2, 1987. By agreement of the parties, the issue of sovereign immunity under the eleventh amendment was reserved for a separate hearing after trial, dependent upon a finding of liability. On December 14, 1988, the district court entered its Findings of Fact and Conclusions of Law in favor of plaintiff.

On April 6, 1989, the district court entered a consent order dismissing the action against the University and the individual defendants in their official capacities, except to the extent that prospective injunctive relief was awarded. Thus, only defendant Dr. Postlethwaite in his individual capacity remained to satisfy any monetary judgment. The district court entered judgment for plaintiff on June 21, 1989, holding Dr. Postlethwaite liable for lost wages in the amount of $52,183.68 and compensatory damages for emotional distress in the amount of $5,000. Dr. Postlethwaite was also ordered to provide plaintiff with any appropriate raises, establish her annual salary at $17,725 and pay contributions into both her pension fund and her social security fund. The district court ordered plaintiff reinstated to her previous position as senior secretary in CTDD and enjoined defendants from terminating plaintiff without notice and a pre-termination hearing. Plaintiff was also awarded attorney's fees in the amount of $45,240.63 and expenses in the amount of $2,016.20.

The district court denied defendants' motion for a new trial or reconsideration of

judgment on August 4, 1989. Defendants filed a timely notice of appeal to this Court on August 15, 1989.

## II.

### THE DISTRICT COURT'S LEGAL ANALYSIS

In concluding that defendants violated plaintiff's procedural due process rights under the fourteenth amendment, the district court first determined that plaintiff possessed a constitutionally protected interest in continued employment as defined in *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The district court correctly stated the requisite constitutional inquiry to be whether rules or understandings, stemming from an independent source, such as state law, amount to an implied promise of continued employment. *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. Specifically, the district court stated:

> The initial question is whether plaintiff had a constitutionally protected interest in continued employment.... Such interests do not arise from the Constitution itself, however, but rather "are created and their dimensions ... defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709.

Joint Appendix at 48–49 (Findings of Fact and Conclusions of Law).

The district court correctly cited *Duncan v. City of Oneida*, 735 F.2d 998, 1000 (6th

no time declined this job. The district court further found that plaintiff was under no obligation at any time prior to October 1 to report to work or to furnish satisfactory documentation justifying her continued absence. She was on worker's compensation leave and had not been released by her doctor. Noting that Carman had stated to plaintiff during the September 28 meeting that he would give her the benefit of the doubt as to whether plaintiff's leave of

absence expired on September 30, the district court also found that the letter itself reflected the defendants' knowledge that plaintiff's worker's compensation claim was pending. The district court concluded that the records concerning plaintiff's leave supported plaintiff's position that she was not placed on a limited period of disability. Joint Appendix at 43 (Findings of Fact and Conclusions of Law).

Cir.1984), for the proposition that this Court has recognized that an implied contract or mutually explicit understanding is sufficient to create a property interest in public employment. *Duncan* involved a 42 U.S.C. § 1983 action brought by a former municipal police officer ("Mr. Duncan") against the City of Oneida and various city officials. Mr. Duncan claimed that the city deprived him of a property interest in his job. In *Duncan,* in affirming the district court's grant of the defendants' motion for a directed verdict, we concluded that the former police officer had failed to set forth any facts to support his claim that he possessed a property interest in continued public employment. Thus, while the outcome in *Duncan* is inapposite to the conclusion reached by the district court, the district court was correct in stating that this Court recognizes that a constitutionally protected property interest may be created by an implied contract or mutually explicit understanding.

The district court also concluded that "[p]laintiff's written and oral communication with Colson, combined with the actions of University officials, letters from Bowen, Harris and Postlethwaite, and the employment status policy, created a mutual understanding, both implicit and explicit, of continued employment of at least six months from September 4, 1984." To support this conclusion, the district court relied on *Soni v. Board of Trustees of Univ. of Tennessee,* 513 F.2d 347 (6th Cir.1975), *cert. denied,* 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976). In *Soni,* we upheld the district court's determination that " 'there existed sufficient objective evidence to vest in plaintiff a cognizable property interest in the form of a reasonable expectation of future and continued employment.' " within the meaning of *Roth* and *Perry.* The basis for the determination that a property interest existed was that the University in *Soni* had "objectively acted toward plaintiff in

such a manner as to reasonably lead him to believe that he was a person with a relative degree of permanency" at the University, thereby creating a viable understanding on the professor's part. *Soni,* 513 F.2d at 350.

■ The district court found, as a matter of law, that plaintiff possessed a property interest in continued employment. "The words, actions and policies of defendants combined to create an implied promise of continued employment and to give plaintiff a legitimate claim of entitlement to such employment." Joint Appendix at 49 (Findings of Fact and Conclusions of Law). In arriving at the conclusion that an implied promise or mutually explicit understanding had been created pursuant to the words, actions and policies of defendants, the district court found that plaintiff's claim of entitlement to continued employment was based on several items of evidence accruing over three cumulative stages of events.[6]

The first stage of events commenced on June 29, 1984, when Bowen advised plaintiff that she had been reappointed and referred her to the Personnel Policies and Procedures Manual. The employment status policy contained in that manual stated that regular staff nonexempt employees were employed for a term expected to be six months or more. This same language was contained in the revised policy of July 1, 1984, despite the additional provision that employees in plaintiff's category were at-will employees. The district court determined that while the reappointment letter and the language of the employment status policy did not create a claim of entitlement to continued employment, they did provide a preclude to defendants' other actions with respect to plaintiff's situation at the University.

These other actions occurring at the second stage were as follows: Dr. Postlethwaite's letter of July 1, 1984, terminating plaintiff's employment within CTDD effec-

---

**6.** The district court's findings of facts in this case are not clearly erroneous and are supported by the evidence. Findings of fact by a district judge should not be reversed unless clearly erroneous. Fed.R.Civ.P. 52(a). A finding of fact will only be clearly erroneous when,

although there is evidence to support it, "the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

tive July 31, 1984, and the modification of this termination date to extend indefinitely while plaintiff sought other employment within the University, pursuant to the July 23, 1984, meeting among plaintiff, Harris and Carman. Both Harris' July 24, 1984, letter and Dr. Postlethwaite's July 26, 1984, letter to plaintiff confirmed the modification of the termination date. The indefinite extension of the termination date led the district court to conclude that:

> "[T]hese assurances, while not amounting to a promise of employment for a particular period of time, reinforced the mutual expectations of the parties about plaintiff's future continued employment with the University. They also negated in large measure the effect of Dr. Postlethwaite's letter terminating plaintiff's employment in the CTDD. After these assurances, plaintiff did not expect to be employed in the CTDD indefinitely, but she did have an expectation of indefinite future employment within the University."

*Id.* at 51.

The third stage of events, upon which the district court based its final conclusion, occurred subsequent to the July meeting and letters. The district court determined that events arising out of Colson's efforts to resolve plaintiff's grievances elevated the parties' expectations of indefinite employment to the level of an implied contract or mutually explicit understanding, thereby creating a property interest in continued employment. Colson was authorized to resolve plaintiff's grievance and to make commitments on behalf of the University administration within the context of grievance resolution. The district court concluded that Colson's September 4, 1984, letter, advising plaintiff that she would be retained as a full time employee within CTDD for up to six months, as well as the subsequent meeting between Colson and plaintiff to discuss Colson's findings, culminated in an implied contract or mutually explicit understanding between the parties that plaintiff would be given a six-month period of employment in rheumatology during which she could seek employment elsewhere in the University. Plaintiff did not

appeal this portion of Colson's decision, rather, she accepted the six month extension of her employment. Reasoning that Colson's commitments to plaintiff, following the previous two stages of events, created a mutually explicit understanding upon which the parties acted, the district court held that plaintiff possessed a property interest in continued employment for at least six months from September 4, 1984. *Id.* at 51.

## III.

### DISCUSSION AND ANALYSIS

#### A.

■ Conclusions of law are subject to de novo review by this Court. *See In re Edward M. Johnson & Assocs., Inc.,* 845 F.2d 1395, 1398 (6th Cir.1988).

■ On appeal, defendants argue that the implied promise or mutually explicit understanding found to exist by the district court fails to establish contractual rights under Tennessee law. Defendants maintain that reference to Tennessee law is required in determining whether a property interest in continued employment has been created. The issue before us, therefore, is whether the district court erred in holding that plaintiff possessed a constitutionally protected interest in continued employment with the University. As stated previously, the district court set forth the correct legal analysis to be applied, but the district court applied the law incorrectly. The district court failed to determine if indeed there existed a basis from which a due process property right stemmed in this case. Our inquiry has yielded no independent basis from which plaintiff can claim a protected property interest. Thus, we find that plaintiff is not entitled to relief under 42 U.S.C. § 1983.

■ "The requirements of procedural due process apply only to the deprivation of interests encompassed by the fourteenth amendment's protection of liberty and property." *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33

L.Ed.2d 548 (1972). Such interests do not arise from the Constitution itself, but rather, "are created and their dimensions ... defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. at 2709. The independent source may be a statute, policy, practice, regulation or guideline. *Bishop v. Wood,* 426 U.S. 341, 347, 96 S.Ct. 2074, 2078, 48 L.Ed.2d 684 (1976). The rules or understandings need not be a formal tenure system or even an explicit contractual provision, but "agreements implied from 'the [defendants'] words and conduct in the light of the surrounding circumstances'" may be sufficient to constitute a protected property interest. *Perry,* 408 U.S. at 602, 92 S.Ct. at 2700 (quoting 3A Corbin on Contracts § 562 (1960)); *see Bishop,* 426 U.S. at 344, 96 S.Ct. at 2077; *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. If such interest is recognized by state law, then the employee possesses a property interest of which the state employer cannot deprive him without providing due process. *Bishop,* 426 U.S. at 344, 96 S.Ct. at 2077.

Thus, while recognizing that a property interest may be created in the absence of an express contractual provision, *Bishop* makes clear that reference must be made to the law of contracts of the state whose law applies:

> A property interest in employment can, of course, be created by ordinance, or by implied contract. In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law.

*Bishop,* 426 U.S. at 344–45, 96 S.Ct. at 2077 (footnote omitted); *see also Perry,* 408 U.S. at 601–02, 92 S.Ct. at 2699–2700 ("[A]bsence of such an explicit contractual provision may not always foreclose the pos-

sibility that [an employee] has a 'property' interest in re-employment. For example, the law of contracts in most, if not all, jurisdictions long has employed a process by which agreements, though not formalized in writing, may be 'implied.'").

In *Bishop,* the Court noted that North Carolina recognized an enforceable expectation of continued public employment only if the employer, by statute or contract, had actually granted some form of guarantee. Whether such a guarantee had been given in that particular case could only be determined by an examination of the particular state statute or ordinance in question. *Bishop,* 426 U.S. at 345, 96 S.Ct. at 2077.

### B.

In the instant case, the district court failed to examine Tennessee contract law. Tennessee law is dispositive of plaintiff's claim of a property interest in continued employment arising out of an implied contract. We are compelled to reverse because Tennessee does not recognize the enforcement of an implied contract against the state and has not done so since 1980.[7]

Article I, section 17, of the Tennessee Constitution provides in part that "suits may be brought against the State in such manner and in such courts as the Legislature may by law direct." This section has been interpreted as a grant of sovereign immunity to the state. Therefore, no suit against the state may be sustained absent express authorization from the Tennessee Legislature. *Greenhill v. Carpenter,* 718 S.W.2d 268, 270 (Tenn.App.1986); *see also Brown v. State of Tennessee,* 783 S.W.2d 567, 571 (Tenn.App.1989) (stating that the state as sovereign is immune from suit except as it consents to be sued); *Stokes v. University of Tennessee,* 737 S.W.2d 545, 546 (Tenn.App.1987) ("[a] statute permit-

---

**7.** We seriously question whether Colson's letter of September 4, 1984, containing his report and recommendation regarding plaintiff's grievance created any kind of contract, implied or otherwise. It merely sets out his recommended resolution of the grievance. At the most it would be an offer to settle on the terms recommended. Plaintiff attempted to accept the part favorable to her and reject the balance. The recommendation did not suggest that it was severable. The attempt at partial acceptance cannot create a contract of any kind. *See Ray v. Thomas,* 191 Tenn. 195, 202, 232 S.W.2d 32, 35 (1950) (stating that "acceptance of an offer must exactly and precisely accord with the terms of the offer").

ting suit against the state must be strictly construed and may not be enlarged upon by implication"), *appeal denied* (1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1110, 99 L.Ed.2d 271 (1988).

The constitutional sovereign immunity is clarified by Tennessee Code § 20–13–102(a), which provides:

> No court in the state shall have any power, jurisdiction, or authority to entertain any suit against the state, or against any officer of the state acting by authority of the state, with a view to reach the state, its treasury, funds, or property, and all such suits shall be dismissed as to the state or such officers, on motion, plea, or demurrer of the law officer of the state, or counsel employed for the state.

Thus, unless the state has expressly consented to be sued, sovereign immunity bars a court from entertaining any suit against the state.

As stated above, the district court relied on *Soni v. Board of Trustees of Univ. of Tennessee*, 513 F.2d 347 (6th Cir.1975), *cert. denied*, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976), in concluding that the written and oral communications with Colson and the actions of University officials created a mutual understanding arising to the level of a property interest in continued employment. We find this application of *Soni* improper.

In *Soni*, this Court held that the eleventh amendment did not bar a monetary judgment against the University of Tennessee. This conclusion was based on the court's finding that the Tennessee Legislature might have waived sovereign immunity with respect to the University pursuant to a statute allowing the University to sue and be sued. *Id.* at 351–52.

However, following the decision in *Soni*, in 1977, the Tennessee legislature amended the state's sovereign immunity statute to provide: "[n]o statutory or other provision authorizing the University of Tennessee and its board of trustees to sue and be sued shall constitute a waiver of sovereign immunity." Tenn.Code Ann. § 20–13–102(b). In *University of Tennes-*

*see v. United States Fidelity & Guaranty Co.*, 670 F.Supp. 1379, 1380–81 (E.D.Tenn. 1987), the court noted that the effect of *Soni* was abrogated by the Tennessee General Assembly in 1977 when the State's Sovereign Immunity Statute was amended by language in Tenn.Code Ann. § 20–13–102(b).

Further examination of Tennessee law applicable at the time this suit was filed reveals that Tennessee had waived its sovereign immunity only with respect to suits against the state based on an express contract or breach thereof. In 1984, the relevant law was to be found in Tenn.Code Ann. § 29–10–101. Although repealed as of January 1, 1985, Tenn.Code Ann. § 29–10–101 was in full force and effect when plaintiff filed suit on November 9, 1984. Tenn.Code Ann. § 29–10–101 provided:

> The several circuit and chancery courts of Davidson County, Tennessee, shall, subject to appeal as provided by law, have jurisdiction to enter judgments against the state founded upon any *express* contract or breach thereof with the state and shall determine all questions of fact involved without the intervention of a jury, subject to the limitations of this chapter. (emphasis added).

The recent decision by the Tennessee Court of Appeals in *Computer Shoppe, Inc. v. State*, 780 S.W.2d 729, 736 (Tenn. App.1989), provides a concise history of Tennessee's waiver of immunity with respect to contract actions against the state, including the elimination of a waiver of implied contract actions:

> When the General Assembly first waived the State's sovereign immunity in 1977, it permitted actions based on "express or implied contract or breach thereof." *See* Act of May 4, 1977, ch. 281 § 1, 1977 Tenn.Pub. Acts 652, 653, codified at Tenn.Code Ann. §§ 29–10–101 through 29–10–103 (1980). The General Assembly narrowed the scope of the waiver in 1980 by eliminating causes of action based on implied contracts. *See* Act of

March 27, 1980, ch. 754 § 1, 1980 Tenn. Pub.Acts 796.

*Id.* at 736.[8]

"[C]ontracts are express when their terms are stated in words at the time the agreement is made." *Thompson v. Woodruff & Co.*, 47 Tenn. (7 Cold) 401, 409 (1870) (quoted in *Computer Shoppe*, 780 S.W.2d at 735).[9] *See also Constantin v. Univ. Tennessee*, No. 86–7–II, slip op., (Tenn.Crim.App. July 9, 1986) (determining that complaint brought by former full professor against University for dismissal without cause did not allege express words or writings which could be considered an express contract, but did allege a de facto tenure contract which arose by implication from the University's conduct, thus the Chancellor properly held he was without jurisdiction to entertain the complaint).

Plaintiff concedes that her claim is "not based on a breach of an express contract." Plaintiff-appellee's brief at 24. Section 29–10–101 grants permission to bring suit only on express contracts. "A determination that plaintiff is not suing on an express contract leaves her with no authority upon which to sue the state." *Greenhill v. Carpenter*, 718 S.W.2d 268, 273 (Tenn.App. 1986).

In *Greenhill*, the Tennessee Court of Appeals held that sovereign immunity barred liability of the Memphis State University ("MSU"), the University president, athletic department and head football

---

**8.** *Computer Shoppe* further stated:

> In 1982, the General Assembly created a special committee to study the manner in which claims against the State and its employees were being processed. *See* Act of April 6, 1982, Senate Joint Resolution 216, 1982 Tenn. Pub. Acts 865. The study committee's report, filed on February 29, 1984, recommended that the State continue to waive its sovereign immunity in contract. *See Report of the Study Committee Created by Joint Senate Resolution 216 of the 92nd General Assembly*, at p. 18 (Feb. 20, 1984). It also recommended legislation to provide for the administrative processing of claims against the State. Section 8(a)(11) of the proposed bill permitted claims against the State for "[a]cts constituting a breach of contract."

> The General Assembly enacted the legislation. However, in the process, it replaced the study committee's proposed breach of contract provision with language similar to Tenn.Code Ann. § 29–10–101(a)(1). *See* Act of May 24, 1984, ch. 972 § 8(a)(12), 1984 Tenn.Pub. Acts 1026, 1030, now codified at Tenn.Code Ann. § 9–8–307(a)(1)(L) (Supp.1988)]. The General Assembly also repealed Tenn.Code Ann. §§ 29–10–101 through 29–10–103. *See Act of May 24, 1984, ch. 972* § 19(b), 1984 Tenn.Pub. Acts 1026, 1035. The Act as codified at Tenn.Code Ann. § 9–8–301 through 9–8–307 (1987 & Supp.1988), provides the statutory basis for the Tennessee Claims Commission's jurisdiction. Thus, Tenn. Code Ann. § 9–8–307(a)(1)(L) permitted claims against the State arising out of "[a]ctions founded on any express contract or breach thereof." *See Computer Shoppe*, 780 S.W.2d at 736.

**9.** The Tennessee Court of Appeals in *Computer Shoppe* was called upon to determine whether an express oral contract was within the jurisdiction of the Tennessee Claims Commission, pursuant to Tenn.Code Ann. § 9–8–307(a)(1)(L) (Supp.1988), which authorized the Commission to hear claims premised upon any express contract or breach thereof. Relying on *American Lead Pencil Co. v. Nashville, C. & St. L. Ry.*, 124 Tenn. 57, 64, 134 S.W. 613 (1911) and *Johnson v. Central Nat'l Ins. Co.*, 210 Tenn. 24, 34–35, 356 S.W.2d 277 (1962), the court in *Computer Shoppe* stated that the Tennessee Supreme Court has recognized the existence of oral contracts, despite dicta to the contrary in *V.L. Nicholson Co. v. Transcom Inv. & Fin. Ltd.*, 595 S.W.2d 474, 482 (Tenn.1980).

The district court's finding that a mutual explicit understanding existed between plaintiff and defendants does not establish an oral express contract under Tennessee's above quoted definition of an express contract, oral or written. There is no point in time prior to plaintiff's termination which evidences a clear, definitive statement of the terms of an agreement regarding plaintiff's continued employment at the University. The mutual explicit understanding found to have existed by the district court was based on the words, actions and policies of defendants. Oral express contracts require the parties' express assent concerning their terms. *See Computer Shoppe*, 780 S.W.2d at 735. Implied contracts do not require express assent concerning the terms of an agreement. *Id.* Implied contracts arise by inference from the parties' conduct, in light of surrounding circumstances. *See Perry*, 408 U.S. at 601–02, 92 S.Ct. at 2699–2700. "The court must look to the conduct of the parties' in light of the circumstances, i.e., the court must look to the atmosphere of the dealings." *Cummins v. Brodie*, 667 S.W.2d 759 (Tenn.App.1983) (citing *V.L. Nicholson Co. v. Transcon Investment and Financial, Ltd., Inc.*, 595 S.W.2d 474 (Tenn.1980). The district court made no factual finding that there was mutual assent to the particular terms of an agreement of plaintiff's continued employment with the University.

coach. The theory of liability was based on an alleged breach of an implied contract to insure the life of a student member of the MSU football team who was killed in an airplane crash while on a recruiting trip with the head coach. *Greenhill* relied on Article I, section 17 of the Tennessee Constitution and Tenn.Code Ann. §§ 20–13–102, 29–10–101(a)(1) in disposing of the claim brought by the mother of the deceased student, Ms. Greenhill. At the trial court level Ms. Greenhill apparently brought suit alleging breach of an express contract, but did so in Shelby County, not Davidson County, as required by Tenn. Code Ann. § 29–10–101(a)(1). However, on appeal, in an apparent attempt to avoid the terms of the statute, Ms. Greenhill claimed that the contract allegedly breached was an implied contract, rather than an express contract, and therefore was not covered by § 29–1–101(a)(1). Ms. Greenhill further claimed that because her claim was not covered by the statute, the Shelby County trial court erred in ruling that it lacked subject matter jurisdiction over her contract claim on the basis that such a claim could only be brought in Davidson County under the provisions of § 29–10–101(a)(1).

The Tennessee Court of Appeals agreed that the contract allegedly breached was an implied contract and thus was not covered by the statute. The court then stated that an implied contract claim left Ms. Greenhill with no authority upon which to sue the state. *Id.* Thus, the court rejected the claim that § 29–10–101(a)(1)'s grant of jurisdiction to Davidson County courts over express contract claims against the state barred implied claims in Davidson County but did not bar such claims absolutely. Specifically, the court stated that "the Tennessee Constitution provides that suits against the state may only be brought 'in such manner and in such courts as the Legislature may by law direct.'" *Id.* at 273 (quoting the Tennessee Constitution, art. I, § 17).

Thus, it is clear that unless the state has expressly waived its sovereign immunity with respect to a theory of relief against the state, such a suit will not be entertained. *Greenhill* involved a claim which misapprehended the nature and effect of the constitutional and statutory provisions for Tennessee sovereign immunity. Tennessee does not recognize the enforcement of implied contract claims against the state.

The result reached by the Tennessee Court of Appeals in *Stokes v. University of Tennessee at Martin*, 737 S.W.2d 545 (Tenn.App.1987), similarly compels the result we reach herein. *Stokes* involved a similar attempt by a claimant to avoid the terms of § 29–10–101(a)(1). In addition to finding that the § 29–10–101 cloaks the University with sovereign immunity, the court reiterated that the statute waives sovereign immunity only with respect to express contract and specifically provided for suits on express contracts in the courts of Davidson County. *Id.* at 546. Like the instant case, *Stokes* was an employee discharge case. The former employee alleged that his termination was arbitrary, capricious, without sound basis and, that by virtue of University personnel policies, he had an expectancy of continued employment and could only be discharged for cause. He, therefore, claimed he had been deprived of his property right in continued employment without due process and in violation of 42 U.S.C. § 1983. The discharged employee argued that § 29–10–101(a)(1) was not applicable to him; similar to the plaintiff in *Greenhill*, he further argued that Weakley County, not Davidson County, as dictated by the statute, was the proper venue for his suit because he was suing on an implied contract and not an express contract. *Id.* at 546.

The *Stokes* court stated that even if the suit were based on an express contract, § 29–10–101(a)(1) mandated dismissal of the suit because the statute related only to express contracts and specifically provided for suits thereon in the courts of Davidson County. Implied contract claims against the state of Tennessee are not recognized and are not enforceable in any court in the state. *See id.*

Because, in 1984, Tennessee did not recognize the enforcement of an implied contract against the state and had not waived

**568**

its sovereign immunity with respect to other than express contract claims against the state, we find that the district court erred in holding that plaintiff possessed a constitutionally protected property interest in continued employment for a period of six months or more. The district court failed to conduct the requisite analysis of state law in this case. *See Bishop,* 426 U.S. at 344, 96 S.Ct. at 2077; *Perry,* 408 U.S. at 601–02, 92 S.Ct. at 2699–2700; *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. Had it done so, no property interest would have been found to have stemmed from Tennessee law based on an implied contract. "[T]he sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop,* 426 U.S. at 344, 96 S.Ct. at 2077. In the instant case, plaintiff's claim of entitlement is clearly insufficient when examined in light of Tennessee law.

This conclusion, that plaintiff does not possess a constitutionally protected property interest in continued employment with the University for the reason that Tennessee has not waived its sovereign immunity with respect to implied contract suits against the state, compels a finding also that the district erred in holding Dr. Postlethwaite liable for damages in his individual capacity because Dr. Postlethwaite did not deprive plaintiff of a recognized property interest under state law.

IV.

CONCLUSION

In sum, because Tennessee does not recognize enforcement of an implied contract against the state, plaintiff's claim necessarily fails. Accordingly, we REVERSE the district court's June 21, 1989, judgment and VACATE the order granting plaintiff reinstatement, restitution, attorneys' fees and costs.