91 F.3d 144
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Roosevelt MITCHELL, Plaintiff-Appellant,
v.
GEORGIA-PACIFIC CORPORATION, Defendant-Appellee.
 No. 95-5067.
 United States Court of Appeals, Sixth Circuit.
 July 15, 1996.
 
 Before: JONES, BOGGS, and COLE, Circuit Judges.
 PER CURIAM.
 
 
 1
 Roosevelt Mitchell appeals the district court's judgment for the defendant-appellee Georgia-Pacific Corporation in his case filed under the provisions of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. For the reasons set forth below, we affirm the district court's judgment in favor of appellee.
 
 I.
 
 2
 Georgia-Pacific Corporation ("Georgia-Pacific") manufactures corrugated containers which range in size from 1.8 square feet to 200 square feet. Plaintiff-Appellant Roosevelt Mitchell, an African-American male, began his employment with Georgia-Pacific's predecessor (Owens-Illinois) in September 1976. He remained an employee of Georgia-Pacific until he was terminated on December 27, 1990.
 
 
 3
 From 1976 through 1989, Mitchell received good job performance reports, and made steady career progression from his initial job to a position as operator of a 191-inch press. The 191-inch press produces the largest and most expensive boxes made in the plant, and Mitchell was responsible for the entire operation of the machine including the printing, scoring and slotting of boxes. Only one 191-inch press existed at the Memphis facility, and it was operated on all three shifts by different operators. Each shift had different supervisors. Mitchell worked at various times under the direction of both African-American and Caucasian supervisors.
 
 
 4
 Mitchell was a member of the United Paperworkers International Union, AFL-CIO, Local 1816 (the "Union"). The Union and Georgia-Pacific executed a Collective Bargaining Agreement ("CBA") which provided a progressive discipline system.[1] The CBA also provided for final and binding arbitration. The progressive discipline provides the following punishment for various work-related offenses:
 
 
 5
 First Offense--oral reprimand;
 
 
 6
 Second Offense (if within six months of First Offense)--written reprimand;
 
 
 7
 Third Offense (if within six months of Second Offense)--three-day layoff;
 
 
 8
 Fourth Offense--termination.
 
 
 9
 Beginning in 1987, the Memphis facility of Georgia-Pacific began the use of "last chance agreements". A last chance agreement provides a habitually disciplined employee an additional opportunity, outside of the progressive discipline system, to remain employed. Last chance agreements are offered to employees on a case-by-case basis.
 
 
 10
 In 1989 Mitchell opened a grocery store. During this same time period, Mitchell worked the second shift (3:00 p.m. to 11:00 p.m.) at Georgia-Pacific and he worked certain weekdays at the grocery store from 8:30 a.m. to 11:00 a.m.. Mitchell also spent a portion of 1988 and 1989 attending courses in air conditioning and refrigeration repair weekdays from 8:00 a.m. to 12:00 noon.
 
 
 11
 Beginning in May 1989 and continuing until December 1990, Mitchell committed twenty-six quality errors. Thirteen of those errors resulted in disciplinary action. Mitchell's supervisor, at that time Bill Bragg, suggested Mitchell enroll in the Concern program--a program offered to Georgia-Pacific employees that provided a wide range of counseling services. Mitchell, however, declined to do so.
 
 
 12
 Mitchell received his first three-day suspension on September 18, 1989. Following the suspension, Mitchell requested and received a two-month leave of absence during which he sought psychological counseling. Georgia-Pacific supervisor Frank Purifoy, who eventually became plant manager, later removed the suspension from Mitchell's employment record. This action provided Mitchell with an additional opportunity to avoid the termination that would have otherwise resulted from his next infraction.
 
 
 13
 Mitchell's performance problems continued, and he eventually received a second three-day suspension in May 1990. Sometime after he received his second suspension, Mitchell complained to Bill Bragg about what he perceived as unfair treatment from Bragg. Specifically, Mitchell stated he believed Bragg was discriminating against him because of his race. After Bragg discussed these allegations with Purifoy, Purifoy expedited Bragg's planned transfer to another shift. Bragg was transferred in August 1990. Charles Suliano became Mitchell's new supervisor.
 
 
 14
 Mitchell's performance continued to deteriorate. He produced another set of unsatisfactory boxes on September 29, 1990. Pursuant to the progressive disciplinary system of the CBA, Mitchell could have been terminated at that time. However, Purifoy offered Mitchell an opportunity to sign a last chance agreement. Mitchell signed the agreement on October 9, 1990. The terms of the last chance agreement provide in pertinent part:
 
 
 15
 This Last Chance Agreement is your final opportunity to fully meet all the duties and requirements of your job as follows:
 
 
 16
 3) You will conform to all the specifications required of each production run you work on [sic]. In other words, the quality of your work will meet the customers' requirements.
 
 
 17
 Your immediate and continued employment is contingent upon your agreement to and meeting of the above listed terms and conditions. Should you fail to meet any one of them your employment with Georgia-Pacific will be terminated.
 
 
 18
 Mitchell committed what would be his twenty-sixth and final production error on December 13, 1990. The cost of the order and importance of the customer caused this incident to be considered a major error. Thus, Mitchell had violated the terms of the last chance agreement. After a careful review of Mitchell's employment record, Purifoy made the decision to terminate Mitchell on December 27, 1990. On that same day, Mitchell filed a grievance in which he requested the opportunity to sign a "second" last chance agreement. Purifoy denied the grievance based upon his personal knowledge of Mitchell's quality record. Mitchell then took his grievance before an impartial arbitrator who determined that Georgia-Pacific had just cause to terminate Mitchell.
 
 
 19
 Alleging he had been discriminated against by Georgia-Pacific in violation of the Civil Rights Act of 1964, Mitchell filed this action in the district court for the Western District of Tennessee.[2] In the district court, Mitchell argued that he was discriminated against because during the time period between May 1989 through August 1990, Bill Bragg treated Caucasian press operators more favorably than Mitchell. The district court rejected this claim concluding that it was not supported by the evidence. Mitchell also argued that the decision to provide him with only one last chance agreement was racially motivated. Mitchell claimed that Purifoy had given two other Georgia-Pacific employees the opportunity to execute two last chance agreements; upon comparison, however, the district court found the two employees were not "similarly situated" with Mitchell. The district court awarded judgment to Georgia-Pacific on all claims. Mitchell appeals that decision.
 
 II.
 
 20
 Because a finding of intentional discrimination, or a lack thereof, is a finding of fact, Federal Rule of Civil Procedure 52(a) sets forth the appropriate standard of appellate review. Fed.R.Civ.P. 52(a); Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985). Rule 52(a) provides: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed.R.Civ.P. 52(a). Therefore, in Title VII discrimination cases, a district court's findings as to intentional discrimination must be reviewed under the "clearly erroneous standard." Pullman-Standard v. Swint, 456 U.S. 273 (1982); Anderson, 470 U.S. at 573; Fed.R.Civ.P. 52(a).
 
 
 21
 A finding of fact is clearly erroneous when, although evidence exists to support it, " 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " Anderson, 470 U.S. at 573 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)); Stotts v. Memphis Fire Dep't, 858 F.2d 289, 295 (6th Cir.1988). Hence, when Title VII cases are tried to a district court without a jury, the appropriate standard of appellate review is "clearly erroneous" as to findings of fact and "de novo" as to conclusions of law. Woolsey v. Hunt, 932 F.2d 555, 563 (6th Cir.), cert. denied, 502 U.S. 867 (1991).
 
 III. TITLE VII CLAIMANTS
 
 22
 We scrutinize Title VII cases under a well-established analytical framework. Title VII claimants have the burden of establishing by a preponderance of the evidence a prima facie case of racial discrimination. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); Diehl v. Tele-Solutions, Inc., 57 F.3d 482, 482 (6th Cir.1995). Specifically, they must produce direct or indirect evidence of intentional racial discrimination. Burdine, 450 U.S. at 256.
 
 
 23
 Once a Title VII claimant makes the requisite showing the burden shifts to the defendant to articulate some legitimate reason for the termination of the employee. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). A defendant rebuts the presumption of discrimination created by the plaintiff's prima facie showing by producing evidence that the plaintiff was terminated for a legitimate non-discriminatory reason. Burdine, 450 U.S. at 254. The defendant's burden is satisfied if it simply explains what it has done or produces evidence of legitimate non-discriminatory reasons. Burdine, 450 U.S. at 256; Wrenn v. Gould, 808 F.2d 493, 501 (6th Cir.1987).
 
 
 24
 If the defendant produces evidence of legitimate non-discriminatory reasons for its actions then the burden shifts back to the claimant, who is afforded an opportunity to show that the defendant's articulated reasons for termination were pretextual. McDonnell Douglas, 411 U.S. at 804. The burden of persuading the trier of fact that the defendant discriminated against the plaintiff because of the plaintiff's race, however, remains at all times with the plaintiff. Burdine, 450 U.S. at 256.
 
 
 25
 Because he is a Title VII claimant, Mitchell has the initial burden of establishing a prima facie case of racial discrimination. McDonnell Douglas, 411 U.S. at 802. Mitchell may establish a prima facie case by showing: (i) he belongs to a racial minority group; (ii) he is qualified for the job from which he was discharged; (iii) he was discharged; and (iv) the position was filled by a non-minority. Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir.1992); see McDonnell Douglas, 411 U.S. at 802. Alternatively, Mitchell may establish a prima facie case by showing, in addition to the first three elements, that a comparable or similarly situated non-minority received better treatment. Harrison v. Metropolitan Gov't of Nashville and Davidson County, Tenn., 80 F.3d 1107, 1115 (6th Cir.1996); Mitchell, 964 F.2d at 582-83; Davis v. Monsanto Chem. Co., 858 F.2d 345, 347 (6th Cir.1988), cert. denied, 490 U.S. 1110 (1989).
 
 
 26
 While establishing a prima facie case is critical to a Title VII claimant's case, the Supreme Court has repeatedly advised that no single formulation of prima facie evidence may fairly be expected to capture the many guises in which discrimination may appear. Furnco Constr. Corp. v. Waters, 438 U.S. 567, 575-76 (1978); McDonnell Douglas, 411 U.S. at 802 n. 13. Hence, the Court has cautioned lower courts to eschew a focus on the precise elements of a prima facie case: "This [prima facie test] of course, was not intended to be an inflexible rule, ... 'the facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.' " Furnco, 438 U.S. at 575-76 (quoting McDonnell Douglas Corp., 411 U.S. at 802 n. 13). The district court recognized the importance of avoiding such a focus, and declined to grant defendant's motion to dismiss Mitchell's case for failure to meet the prima facie requirements.
 
 
 27
 Since the district court treated Mitchell as having met the primary burden, Georgia-Pacific had the burden of articulating some legitimate, non-discriminatory reason for Mitchell's termination. See McDonnell Douglas, 411 U.S. at 802. The district court found Georgia-Pacific had met its burden by stating that Mitchell's "serious and excessive" quality errors, as well as his violation of the last chance agreement, were the reasons for his termination. Nothing more was required of Georgia-Pacific because an "employer's burden is satisfied if [it] simply 'explains what [it] has done' or 'produces evidence of legitimate nondiscriminatory reasons.' " Board of Trustees of Keene State College v. Sweeney, 439 U.S. 24, 25 n. 2 (1978) (citation omitted). Georgia-Pacific met its burden; thus, the burden shifted back to Mitchell who was required to establish that Georgia-Pacific's articulated reasons for his termination were pretextual. McDonnell Douglas, 411 U.S. at 804; Mitchell, 964 F.2d at 584.
 
 
 28
 In St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993), the Supreme Court clarified the standards Title VII claimants must meet to establish that a defendant's articulated reason is a pretext: "A reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false and that discrimination was the real reason. Id. at 515. Three methods exist by which Mitchell might have shown that Georgia-Pacific's stated reasons for terminating him constituted a mere pretext: 1) the stated reasons had no basis in fact; 2) the stated reasons were not the actual reasons; or 3) the stated reasons were insufficient to explain the employer's actions. Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078, 1084 (6th Cir.1994); Wheeler v. McKinley Enterprises, 937 F.2d 1158, 1162 (6th Cir.1991). After reviewing the evidence, the district court concluded that Mitchell failed to establish, by a preponderance of the evidence, that Georgia-Pacific terminated him because of his race. Mitchell claimed Bragg treated him harshly because of his race, but treated the Caucasian workers leniently. The district court found Bragg only supervised the second shift (Mitchell's shift) during the relevant time period. Bragg, the district court reasoned, had no occasion to discipline or supervise the other 191-inch press operators. Therefore, Mitchell not only failed to prove that Georgia-Pacific's proffered reasons were false, but he also failed to prove the real reason for his termination was racial discrimination. Thus, as to this claim Mitchell has failed to prove Georgia-Pacific's articulated reasons for termination were pretextual.
 
 
 29
 Mitchell also argued Georgia-Pacific's extension of offers of second last chance agreements to two similarly situated Caucasian employees, but denial of a second last chance agreement to him, was racially motivated and discriminatory. We utilize a straightforward test in determining whether a proposed comparable employee (or proposed comparable employees) is, in fact, similarly situated:
 
 
 30
 In order for two or more employees to be considered similarly-situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the ... employees who he alleges were treated more favorably. The similarity must exist in all relevant aspects of their respective employment circumstances.
 
 
 31
 Pierce v. Commonwealth, 40 F.3d 796, 802 (6th Cir.1994); Mitchell v. Toledo Hospital, 964 F.2d 577, 583 (6th Cir.1992).
 
 
 32
 While precise equivalence in culpability between employees is not required, Harrison, 80 F.3d at 1115, Mitchell was required to prove that all of the relevant aspects of his employment situation were "nearly identical" to the employment situations of the two Caucasian employees in order to illustrate that he was similarly situated with them. Pierce, 40 F.3d at 802. The district court concluded that Purifoy based the decision to terminate Mitchell upon Mitchell's December violation of the last chance agreement. The district court determined that Purifoy refused to offer Mitchell a second last chance agreement because Purifoy "felt he had already given plaintiff two opportunities to save his job at the time plaintiff violated the last chance agreement." The district court also noted several distinctions between each comparable employee's employment situation and that of Mitchell's. Specifically:
 
 
 33
 The proof shows that Kevin Briggs [a Caucasian employee] did not violate his initial Last Chance Agreement because his costly performance error did not occur within the 90 day period called for in the agreement. A performance error did occur over 120 days from the date of the first Last Chance Agreement. When his Second Last Chance Agreement was signed it contained no cutoff provision; therefore, Mr. Briggs was terminated promptly after his performance problem which violated his Second Last Chance Agreement.
 
 
 34
 * * *
 
 
 35
 * * *
 
 
 36
 Trent Kirk was the other white employee who was given a Second Last Chance Agreement. Mr. Kirk executed his first Last Chance Agreement after six disciplinary actions ... Nevertheless, he had another production error within 90 days which violated his first Last Chance Agreement. However, ..., his immediate supervisor, James Ferby, a black male, strongly recommended to Frank Purifoy, the black plant manager, that Kirk have a Second Last Chance Agreement. This did not have the 90 day provision; however, the entire agreement was rescinded on July 9, 1991, due to Kirk's outstanding job performance approximately seven months after his violation of his first Last Chance Agreement. Therefore the Court concludes that Mr. Kirk's problems were not comparable to those of plaintiff. He was not similarly situated to plaintiff; and there was no racial discrimination in the handling of the two employees by defendant.
 
 
 37
 These distinctions led the district court to conclude that the two Caucasian employees were not similarly situated to Mitchell.
 
 
 38
 Under the circumstances presented here, the relevant aspects of Mitchell's employment are not "nearly identical" with those of either Kirk or Briggs. Mitchell failed to prove that he and the "comparables" were similarly situated. Hence, Mitchell has failed to prove pretext. Accordingly, the district court's finding that Georgia-Pacific did not intentionally discriminate against Mitchell because of his race was not clearly erroneous.
 
 IV.
 
 39
 Next, Mitchell contends that the district court's findings of fact "differ dramatically from its findings immediately at the conclusion of the trial." Mitchell further claims the district court's formal findings of fact contradict its oral findings of fact. Federal Rule of Civil Procedure 52(a) delineates the requirements district courts must fulfill when called upon to issue findings of fact. Rule 52 authorizes, among other things, district court judges to issue oral findings of fact. It states in pertinent part:
 
 
 40
 In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon.... Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses ... It will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence or appear in an opinion or memorandum of decision filed by the court.
 
 Fed.R.Civ.P. 52(a)
 
 41
 Mitchell correctly argues that the district court clearly abandoned its immediate reaction. However, immediate reactions or initial opinions cannot be equated with findings of fact. The district court did not issue oral findings of fact at the close of proof. In fact, the trial judge reserved the right to modify his initial observations after he had an opportunity to review the matter. The court stated:
 
 
 42
 But ya'll think about that, and I'll give you my reaction to it with the understanding it's not a ruling. And I reserve the right to reverse my thoughts. (emphasis added) [and];
 
 
 43
 I'm inclined, and of course I don't mean that Mr. Gerson can't propose findings that show I was mistaken in some of the things I would find or conclude based on what I've said. And I reserve the right to have my mind changed. (emphasis added).
 
 
 44
 At the close of proof, the court simply shared its initial thoughts regarding the merits of the case with the parties. The court also requested the parties file proposed findings of fact with the court. This further negates Mitchell's argument that the district court issued oral findings of fact at the close of proof. Because the district court never issued oral findings of fact, Mitchell's claim that the district court's formal findings contradicted its "oral findings" lacks merit.
 
 V.
 
 45
 For the foregoing reasons, the district court's judgment in favor of defendant-appellee Georgia-Pacific is AFFIRMED.
 
 
 
 [1]
 The agreement was originally between Nekoosa Packaging Corporation and the United Paperworkers International Union, AFL-CIO, Local 1816; it became applicable to Georgia-Pacific when Georgia-Pacific purchased Nekoosa Packaging
 
 
 [2]
 Because this cause of action arose between May 1989 and December 1990, it is not governed by the 1991 amendments to the Civil Rights Act of 1964